KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
Joseph C. Corneau
200 West 41st Street, 17th Floor
New York, NY 10036
Tel. (212) 972-3000
Fax. (212) 972-2245

*Proposed Attorneys for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CHINACAST EDUCATION CORP., | : | Case No. 16-_____ (___) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

## DECLARATION OF DOUGLAS WOODRUM PURSUANT TO LOCAL BANKRUPTCY RULES 1007-2 AND 9077-1

Douglas Woodrum, declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am the Chief Financial Officer and a member of the Board of Directors of ChinaCast Education Corp. ("ChinaCast," "Debtor" or "Company").  In accordance with the Local Bankruptcy Rules ("L.B.R.") 1007-2 and 9077-1 of the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), I submit this declaration ("Declaration") in connection with the above-captioned Chapter 11 case (the "Chapter 11 Case").

2.      I am familiar with the business and financial condition of the Debtor.  In making any and all financial representations in this Declaration, I am relying on my own personal knowledge and on financial statements and other financial information as compiled, prepared

1

and/or submitted to me by employees and agents of the Debtor.  Unless otherwise indicated, all

financial information contained herein is presented on an estimated and unaudited basis.

3.      If I were called to testify, I would testify competently to the facts set forth in this

Declaration and I am authorized to submit this Declaration on behalf of the Debtor.

I.     **Required Contents of Declaration**

A.      Nature of Debtor's Business.

4.      Founded in 1999 by Ron Chan Tze Ngon ("Chan"), ChinaCast was in the

business of providing college-level education to students in China both on-campus and on the

internet. Chan began serving as Chief Executive Officer and Chairman in 1999. Before Chan's

looting of the Company described in greater detail below, ChinaCast owned and operated three

universities in China: the Foreign Trade and Business College of Chongqing Normal University,

the Lijiang College of Guangxi Normal University and the Hubei Industrial University Business

College, in addition to internet-based interactive distance learning applications, multimedia

education content delivery, and vocational training courses.

5.      The Company was initially formed in Singapore under the name ChinaCast

Communications Limited. In 2004, it changed its name to ChinaCast Communications Holdings

Limited and made an initial public offering on the Singapore Stock Exchange. In 2006, Great

Wall Acquisition Corporation, a publicly-traded Delaware corporation, acquired 100% of

ChinaCast Communications Holdings Limited via tender offer in a reverse merger transaction,

and in 2007, renamed itself ChinaCast Education Corporation. The Company was then listed on

NASDAQ.

6.      As a result of Chan's looting of Chinacast in 2012 described in greater detail below, the Debtor was left in financial ruin, has no current operations, and is winding up its affairs.

B.      <u>Organizational Structure, Capital Structure and Corporate Status.</u>

7.      ChinaCast is a publicly-held corporation organized under the law of Delaware. It is governed by a five-member Board of Directors (the "<u>Board</u>") consisting of (i) myself, (ii) Ned Sherwood, (iii) Derek Feng, (iv) Steve Marksheid and (v) Daniel Tseung. I am the Debtor's sole officer.

8.      To finance the prosecution of the Recovery Actions (defined below), the Debtor issued a series of promissory notes and other unsecured obligations to certain of its shareholders in exchange for funds received by the Debtors (collectively, the "<u>Recovery Action Debt</u>"). As of the Petition Date, the Recovery Action Debt outstanding totaled approximately $9,380,647.

9.      In addition to the Recovery Action Debt, the Debtor owes vendors, professionals and other commercial parties approximately $12,893,088 in the aggregate.

10.     Once traded on the NASDAQ stock exchange under the symbol CAST, and then over the counter until June 2015 when the Debtor's registration was revoked by the Securities and Exchange Commission, the Debtor has 100 million shares of common stock issued and 49,020,291 shares outstanding. To the best of my knowledge, there has been no active market in the Company's common stock in quite some time. There is no other class of equity securities in the Debtor.

11.     On March 1, 2014, the Secretary of State of Delaware proclaimed that the Debtor was no longer in good standing for failure to pay taxes. The Debtor is and has been winding up

3

its affairs pursuant to section 278 of the Delaware General Corporation Law. I understand that

under section 278 of the Delaware General Corporation Law, a dissolved corporation continues

in existence for a period of three (3) years from its dissolution for the limited purposes of

winding up its affairs. The Debtor is winding up its affairs within the limitations provided by

section 278 of the Delaware General Corporation Law.

      C.     <u>Background and Need for Filing.</u>

      (i)  *The Looting of the Company.*

12.    As stated above, ChinaCast was in the business of providing college-level

education to students in China physically and via the internet. In March 2012, the Board of

Directors of ChinaCast removed Chan from his role as Chairman and CEO when it learned that

Chan was attempting to thwart an annual audit. Within a week of Chan's termination, ChinaCast

disclosed that the Company had "uncovered questionable activities and transactions which raise

the specter of possible illegal conduct by Ron Chan and his accomplices," and that an

investigation would follow.

13.    On April 12, 2012, the Company disclosed that it was also investigating the

possible transfer of interests in certain of the Company's schools to unauthorized parties,

potentially involving Chan and other individuals. On May 14, 2012, the Company disclosed that

it was investigating the wrongful withdrawal of approximately $120 million from Company

accounts. On June 12, 2012, the Company disclosed that it had confirmed the wrongful

withdrawal of funds from Company accounts and further disclosed that it had come to believe

that Chan and others may have transferred control of the Company's interests in certain of the

schools operated by ChinaCast without authorization.

(ii) *The Securities Fraud Class Action*.

14.     An initial securities fraud class action complaint was filed against ChinaCast on

May 25, 2012. Following the consolidation of several related actions against the Company and

others, and the appointment of lead plaintiffs, a consolidated class action complaint (the "Class

Action Complaint") styled *In re ChinaCast Education Corporation Securities Litigation* (the

"Class Action") was filed in the United States District Court for the Central District of California

(the "District Court"), Case No. CV 12-04621-JFW (PLAx) on September 17, 2012. The Class

Action Complaint asserted causes of action under, *inter alia*, section 10(b) of Securities

Exchange Act of 1934 and Rule 10b-5 promulgated thereunder against ChinaCast, as well as

Derek Feng, Stephen Marksheid, Ned Sherwood and Daniel Tseung (together, the "Independent

Directors"), the members of the Board during the time of Chan's looting of the Company other

than Chan. Chan was not named as a defendant in the Class Action Complaint.

15.     On October 15, 2012, ChinaCast and the Independent Directors moved to dismiss

the Class Action Complaint. On December 7, 2012, the District Court granted the motion to

dismiss (the "District Court Decision"), a copy of which is annexed hereto as **Exhibit 1**. The

District Court ruled among other things, that (i) the plaintiffs failed to adequately plead the level

of scienter by each of ChinaCast and the Independent Directors required to sustain a private

cause of action under section 10(b) and Rule 10b-5 and under the Private Securities Litigation

Reform Act; (ii) that Chan's state of mind could not be imputed to the Company because of the

so-called "adverse interest" exception to agency common law; and (ii) because the Independent

Directors had no knowledge of Chan's concealed looting of the Company or facts sufficient to

constitute "reckless disregard" of facts that would have caused the Independent Directors to

know of Chan's looting of the Company, the claims against them had to be dismissed.

16.     The plaintiffs in the Class Action appealed the District Court Decision, but solely

as to ChinaCast. Almost three (3) years after the District Court Decision, on October 23, 2015,

the United States Court of Appeals for the Ninth Circuit reversed the District Court in a

published decision (the "Ninth Circuit Decision")[1], a copy of which is annexed hereto as **Exhibit
2**, ruling that the adverse interest exception itself had exceptions when necessary to protect the

rights of a third party who dealt with the principal in good faith.

17.     Upon remand, without sufficient resources to defend against the Class Action any

further, the Company did not answer the Class Action Complaint. A hearing on the plaintiffs'

motion for entry of a default judgment is scheduled for November 14, 2016.

D.      Purpose of Filing

18.     Prior to the Petition Date, the Debtor commenced seven (7) actions (the

"Recovery Actions") that are currently pending in the United States and in Hong Kong. Under

the protection of the Bankruptcy Code, the Debtor intends to maximize the value of its enterprise

by continuing to wind-up its affairs, including, without limitation, the continued pursuit of the

Recovery Actions without the distraction and substantial costs of having to defend against the

Class Action.

---

[1] 809 F.3d 471 (9th Cir. 2015). The Ninth Circuit's decision has been met with academic criticism. See
*Securities Law—Rule 10B-5—Ninth Circuit Effectively Eliminates Adverse-Interest Exception as a
Defense to Fraud-on-the-Market Claims*, 129 Harv. Law Rev. 2273, 2280: "[m]oving beyond the restraint
embodied in the Supreme Court's approach to private securities fraud liability, the Ninth Circuit placed
undue reliance on standard policy rationales to justify disabling corporations that have been looted by
rogue executives from using the adverse-interest exception. As a result, the Ninth Circuit simply shifted
the burden of losses to others within the very class that it sought to protect—innocent shareholders."

19.     The Debtor expects to promptly file a Chapter 11 plan that establishes a litigation

trust, which will then continue pursuit of the Recovery Actions until completed.

20.     It is further expected that such plan will invoke section 510(b) of the Bankruptcy

Code with respect to the claims asserted in the Class Action, which mandates the subordination

of claims arising out of the purchase or sale of a security to all claims or interests that are senior

or equal to the claim or interest represented by such security.

E.      Debtor's Case Not Originally Commenced Under Chapter 7

21.     The Chapter 11 Case was not originally commenced under chapter 7 of the

Bankruptcy Code.  Accordingly, L.B.R. 1007-2(a)(2) is not applicable.

F.      Pre-petition Creditors' Committee

22.     In accordance with L.B.R. 1007-2(a)(3), to the best of the Debtor's knowledge, no

pre-petition creditors' committee has been formed.

G.      Holders of the Twenty Largest Unsecured Claims

23.     In accordance with L.B.R. 1007-2(a)(4), a consolidated list setting forth the

Debtor's twenty (20) largest unsecured creditors excluding those persons who constitute

"insiders" under Bankruptcy Code section 101(31) of the Debtor is attached as **Exhibit 3**.  As

required by L.B.R. 1007-2(a)(4), Exhibit 2 includes the creditors' names, addresses, telephone

numbers (for persons familiar with the account, if available), amount of each claim, and an

indication of whether the claims are contingent, unliquidated or disputed.

H.      Holders of Five Largest Secured Claims

24.     In accordance with L.B.R. 1007-2(a)(5), the Debtor has no secured creditors.

I.      Summary of Assets and Liabilities

25.     As required by L.B.R. 1007-2(a)(6), a summary of the Debtor's assets and

liabilities is attached as **Exhibit 4**.

J.      Debtor's Securities.

26.     The Debtor has one class of common stock that is publicly held. There are

100,000,000 shares of common stock issued and 49,020,291 outstanding. The Debtor's common

stock was once traded on NASDAQ under the symbol CAST, and later, until June 2015, over the

counter, when its registration with the Securities and Exchange Commission was revoked. The

Debtor does not have current information on all of the holders of the Debtor's common stock or

the amount of shares held by such holders[2]. I personally own 900,000 shares, or less than 2%, of

the outstanding shares, and Daniel Tseung holds less than 1% of the outstanding shares. The

Debtor's other directors do not own any shares of the Debtor's common stock.

K.      Property in Possession or Custody of Custodian

27.     In accordance with L.B.R. 1007-2(a)(8), the Debtor has no property in possession

or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured

creditor, or agent for any such entity.

L.      Premises Where the Debtor Conducts Business

28.     In accordance with L.B.R. 1007-2(a)(9), to the extent the Debtor conducts any

business, it is done at 5 Vista Real, Mill Valley, California 94941. The Debtor has maintained a

bank account at Citibank in New York City since 2012.

M.      Location of Debtor's Assets and Books and Records

29.     Pursuant to L.B.R. 1007-2(a)(10), the majority of the Debtor's books and records

are maintained 5 Vista Real, Mill Valley, California 94941.  The Debtor has no physical assets.

N.      Threatened or Pending Actions Against the Debtor

30.     Pursuant to L.B.R. 1007-2(a)(11), a list of pending or threatened actions is

annexed hereto as **Exhibit 5**.

O.      The Debtor's Senior Management

31.     Pursuant to L.B.R. 1007-2(a)(12), the Debtor's senior management consists of:

> Douglas Woodrum, Chief Financial Officer: Mr. Woodrum holds bachelor's
> degrees in accounting and finance from the University of Iowa. He was
> previously the Chief Financial Officer at Heritage Media Corporation and CNET
> Networks, Inc., which were publicly traded companies at the time.

## II.     Additional Information Required by L.B.R. 1007-2(b)

32.     In accordance with L.B.R. 1007-2(b), the Debtor intends to continue the operation

of its business and the management of its property as a debtor and debtor in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.

33.     In accordance with L.B.R. 1007-2(b)(1), the estimated amount of the weekly

payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty

(30) day period following the Petition Date is approximately $0.00.

34.     In accordance with L.B.R. 1007-2(b)(2), the amounts paid and proposed to be

paid for the thirty (30) day period following the Petition Date for services rendered by the

Debtor's officers is approximately $0.00.

---

[2] As a result, the Debtor is unable to file the list of equity security holders required by Rule 1007(a)(3) of
the Bankruptcy Rules.

35.    The Debtor does not expect to retain a financial or business consultant, therefore L.B.R. 1007-2(b)(2)(C) is not applicable.

36.    In accordance with L.B.R. 1007-2(b)(3), the Debtor is winding down and does not expect any material receipts or disbursements during the 30-day period following the filing of the Chapter 11 Case, nor does it expect to generate any receivable or incur any material obligation during this time, other than professional fees.

**III.    Conclusion**

37.    The Debtor believes that the protections afforded by chapter 11 will enable it to maximize the value of the Debtor, for its creditors and its estate.

Dated: New York, New York
         November 9, 2016

                                        */s/ Douglas Woodrum*
                                         Douglas Woodrum
                                         Chief Financial Officer

## **Exhibit 1**

## **District Court Decision**

**UNITED STATES DISTRICT COURT**                                   JS-6
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No.   **CV 12-4621-JFW (PLAx)**                    Date: December 7, 2012

Title:     IN RE CHINACAST EDUCATION CORPORATION SECURITIES  LITIGATION

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

     **Shannon Reilly**                          **None Present**
     **Courtroom Deputy**                        **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**     **ATTORNEYS PRESENT FOR DEFENDANTS:**
          None                                      None

**PROCEEDINGS (IN CHAMBERS):**      **ORDER GRANTING DEFENDANTS CHINACAST
                                    EDUCATION CORPORATION AND ITS INDEPENDENT
                                    DIRECTORS' MOTION TO DISMISS THE
                                    CONSOLIDATED CLASS ACTION COMPLAINT [filed
                                    10/15/12; Docket No. 44]**

     On October 15, 2012, Chinacast Education Corporation ("Chinacast") and Derek Feng
("Feng"), Stephen Markscheid ("Markscheid"), Ned Sherwood ("Sherwood"), and Daniel Tseung
("Tseung")[1] filed a Motion to Dismiss the Consolidated Class Action Complaint ("Motion").  On
October 29, 2012, Lead Plaintiffs Costa Brava Partnership III LP ("Costa Brava") and Jayhawk
Private Equity Fund II LP ("Jayhawk") (collectively, "Plaintiffs") filed their Opposition.  On November
12, 2012, Defendants filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure
and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without
oral argument.  The matter was, therefore, removed from the Court's November 19, 2012 hearing
calendar and the parties were given advance notice.  After considering the moving, opposing, and
reply papers, and the arguments therein, the Court rules as follows:

**I.     Factual and Procedural Background**

**A.     The Defendants**

     ChinaCast is a Delaware corporation in the business of providing college-level education to

---

     [1] Collectively, Feng, Markscheid, Sherwood, and Tseung are referred to as the "Individual
Defendants."  The Individual Defendants and Chinacast are collectively referred to as
"Defendants."

students in China both on-campus and on the internet.  During the putative class period, from February 14, 2011 until April 2, 2012, ChinaCast was listed on the NASDAQ stock exchange. Markscheid has served as a member of ChinaCast's Board of Directors since October 3, 2011. Sherwood has served as a member of the Board of Directors since 2009.  Tseung has served as a member of the Board of Directors since 2007.  Feng has served as a member of ChinaCast's Board of Directors since January 17, 2012, and, upon the termination of Ron Chan Tze Ngon ("Chan"), Feng agreed to serve as Chairman and Interim CEO.  Sherwood and Tseung, along with Justin Tang ("Tang"), are members of ChinaCast's audit committee.

## B.   Procedural Background

On May 25, 2012, Alejandro Puente ("Puente") filed a putative class action against ChinaCast, Chan, and Antonio Sena ("Sena") on behalf of all purchasers of ChinaCast securities between February 14, 2011, and April 2, 2012, alleging claims for relief for: (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5; and (2) violation of Section 20(a) of the Exchange Act [Case No. CV 12-4621-JFW (PLAx)] (the "*Puente* Action").  On June 12, 2012, Eliahu Nakash ("Nakash") filed a separate putative class action against the same defendants on behalf of all purchasers of ChinaCast securities between February 14, 2011, and April 2, 2012 [Case No. CV 12-5107-JFW (PLAx)] (the "*Nakash* Action"), with virtually identical factual allegation, and alleging the same claims for relief, as in the *Puente* Action.  On August 22, 2012, the Court consolidated the *Puente* Action and the *Nakash* Action, appointed Costa Brava and Jayhawk as lead plaintiffs, and appointed lead counsel.  On September 17, 2012, Plaintiffs filed their Consolidated Class Action Complaint ("Complaint") against ChinaCast, Chan, Sena, Michael Santos ("Santos"), Tang, Tseung, Sherwood, Markscheid, and Feng.  In their Complaint, Plaintiffs allege claims for relief for: (1) violation of Section 10(b) of the 1934 Act and Rule 10b-5; and (2) violation of Section 20(a) of the 1934 Act.

## C.   Chan's Looting and Removal

Chan was the founder of ChinaCast and began serving as CEO and Chairman in 1999.  On March 26, 2012, the Individual Defendants removed Chan as Chairman and CEO when they discovered that Chan was attempting to interfere with an annual audit of ChinaCast.  On April 2, 2012, ChinaCast disclosed that, following Chan's removal, ChinaCast "uncovered questionable activities and transactions which raise the specter of possible illegal conduct by Ron Chan and his accomplices…."  ChinaCast also announced that it would continue to investigate and, if necessary, pursue all appropriate civil and criminal legal remedies.  On April 19, 2012, ChinaCast filed a Form 8-K with the SEC that stated, in part:

> The Company is also continuing to investigate whether there were questionable activities involving current and former employees, and if so, whether to pursue relevant civil and criminal legal remedies.  In this regard, the Company's interim management team, along with various legal advisors and forensic consultants, has discovered the following matters which remain under investigation:
>
>> the unauthorized transfer of subsidiaries holding interests in two of the Company's colleges . . . to unauthorized persons outside of the Company group structure. The Company believes that its former chief

investment officer and president-China, Mr. Xiangyuan Jiang [("Jiang")], who was terminated on March 29, 2012, may have been involved in these unauthorized transfers.

The Form 8-K also revealed that ChinaCast was investigating other possibly illegal and unauthorized actions by Chan, Jiang, and others, including their efforts: to prevent the preparation of its consolidated financial statements, to destroy ChinaCast documents, to remove computers from ChinaCast's Shanghai office without authorization, to engage in undisclosed related party transaction, to engage in undisclosed third party loans, and to engage in the suspicious trading of ChinaCast securities.

As the investigation unfolded, ChinaCast filed a Form 8-K with the SEC on May 14, 2012, which disclosed that its investigation had expanded to include the possible wrongful withdrawal of approximately $120 million from ChinaCast's accounts. On June 12, 2012, ChinaCast filed another Form 8-K with the SEC that disclosed its investigation had confirmed the wrongful withdrawal of funds from its accounts. The Form 8-K also disclosed that ChinaCast believed that Chan, Jiang, and others may have transferred control of ChinaCast's interests in certain private colleges to unauthorized third parties without the knowledge or approval of the Board of Directors. The Form 8-K reported that ChinaCast was continuing to investigate the unauthorized transfers and was considering the legal remedies available to it to recover its interest in the colleges, including possible criminal action.

Immediately after it announced that it had discovered Chan had looted corporate assets, ChinaCast, through the Individual Defendants, pursued all available legal remedies to recover ChinaCast's assets, including its civil and criminal legal remedies in China.

### D.    Summary of Factual Allegations in the Complaint

According to Plaintiffs, Defendants were aware of the weaknesses in ChinaCast's internal controls substantially before Chan's removal as CEO and Chairman. Specifically, Plaintiff alleges that in its 10-K for the year ending December 31, 2010, ChinaCast noted that its auditor, Deloitte Touche Tohmatsu CPA Ltd. (an affiliate of Deloitte & Touche, LLP) ("Deloitte"), had uncovered at least two material weaknesses in ChinaCast's internal controls. According to Deloitte, one of those weaknesses involved the Board of Director's failure to authorize a non-recurring, irregular contract that should have been approved by the Board of Directors before that contract was signed. In response to Deloitte's findings, the Board of Directors vowed to "step up" its efforts to approve all non-recurring, irregular contracts before they were signed, and assured investors that "the board and the management took Deloitte's points seriously and we basically will be putting all the resources to rectify these problems and make sure that we get that clean report again come the New Year."

Plaintiffs also allege that Defendants ignored several "red flags" during 2011 because there were a series of public scandals that should have alerted directors of China-based, U.S-listed

companies, such as ChinaCast, that the companies they directed posed acute fraud risks.[2] Plaintiffs further allege that despite these warning signs -- both company-specific and sector-wide -- and despite the Board of Director's agreement to immediately review all "non-recurring, irregular contracts," the Board of Directors recklessly allowed or failed to prevent Chan from siphoning cash from ChinaCast in a series of related-party transactions beginning in approximately June 2011. In addition, Plaintiffs allege that the Board of Directors allowed the filing of financial statements with the SEC that omitted any mention of these transactions.[3]

Moreover, Plaintiffs allege that Defendants engaged in misleading conduct when they decided to search for a firm that was interested in acquiring ChinaCast despite the obviousness and pervasiveness of the fraud. Plaintiffs allege that soon after Chan began openly transferring ChinaCast's resources to himself, ChinaCast began to seek an acquirer. Specifically, Plaintiffs allege that in early June 2011, Defendants Chang and Tang met with the managing director of a private equity firm ("Firm A"), and, on that same day, Tang disclosed to the Board of Directors that Firm A had expressed an interest in investing in or acquiring ChinaCast. Plaintiffs also allege that, on August 4, 2011, Defendant Sena informed the Board of Directors that ChinaCast had received a bid from another company ("Company B") to acquire all of ChinaCast's shares, and this bid offered ChinaCast between $6.46 and $6.94 per share, which included a significant premium over the July 29, 2011 closing price of $4.92. Plaintiffs allege that ChinaCast failed to promptly disclose the existence of the bid to the investing public, and that Sherwood, capitalizing on his knowledge of the potential acquisition, purchased a block of 107,305 shares for $5.00 each on August 12, 2011.[4]

Plaintiffs allege that the truth regarding the fraud began to be revealed on October 3, 2011, when ChinaCast announced that it was suspending its previously-announced stock buyback plan, and disclosed that it was hiring an independent auditing firm, FTI Consulting, Inc. ("FTI"), to audit its cash balances. That day, ChinaCast's stock price fell $1.11 per share, and closed at $2.58 per share. In a press release on October 4, 2011, ChinaCast claimed that its engagement of FTI did

---

[2] In their Complaint, Plaintiffs discuss various public statements and media reports from 2011 to support its allegation that ChinaCast, by virtue of being a China-based, U.S-listed company, was an acute fraud risk. For example, SEC Commissioner Luis Aguilar, the Public Company Accounting Oversight Board ("PCAOB"), and various news reports purportedly called attention to the acute fraud risks posed by China-based companies listed on U.S. exchanges. Plaintiffs also cite to a letter dated April 11, 2011, from the Honorable Patrick T. McHenry, in his capacity as Chairman of the House Subcommittee on TARP, Financial Services, and Bailouts of Public and Private Programs, asking the SEC to outline its efforts to protect investors from fraud committed by companies based in China.

[3] Plaintiff's allege that after Chan was removed, ChinaCast's SEC filings disclosed that the related-party transfers: were "frequent (almost daily)"; were "readily identifiable and significant"; "involv[ed] family members, friends and related companies of Prior Management"; "appear to be unconnected and inconsistent with [ChinaCast's] historical revenue collection cycle and normal expenditures for operations"; and amounted to $120 million.

[4] Plaintiffs allege that this purchase would have allowed Sherwood to net between $156,000 and $207,000 if Company B's bid had been accepted.

Initials of Deputy Clerk __sr__

not result from any company-specific concern, but that FTI had been engaged "[a]s a result of several incidents that have been reported by auditors of other publicly held Chinese operating companies that have been unable to properly confirm cash balances."

## II.  Legal Standard

Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") govern the pleading requirements for claims under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  *See Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999); *Cooper v. Pickett*, 137 F.3d 616, 628 n. 2 (9th Cir. 1997).

Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The heightened pleading requirements of Rule 9(b) are designed "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993).  In order to provide this required notice, "the complaint must specify such facts as the times, dates, places, and benefits received, and other details of the alleged fraudulent activity." *Id.* at 672.  Further, "a pleader must identify the individual who made the alleged representation and the content of the alleged representation." *Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 100 F. Supp. 2d 1086, 1094 (C.D. Cal. 1999).

The PSLRA requires a heightened pleading standard for allegations regarding misleading statements and omissions that is similar to the heightened pleading standard required by Rule 9(b).  "The purpose of this heightened pleading requirement was . . . to put an end to the practice of pleading 'fraud by hindsight.'" *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084-85 (9th Cir. 2002) (quoting *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 988 (9th Cir. 1999)).  The PSLRA specifically provides:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

In addition, the PSLRA requires a heightened pleading standard for state of mind: "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see also Silicon Graphics*, 183 F.3d at 974 ("We hold that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct").  "To allege a 'strong inference of deliberate recklessness,' [the plaintiffs] 'must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.'" *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 388 (9th Cir. 2002) (quoting *Silicon Graphics,* 183 F.3d at 974).  "[R]ecklessness only satisfies scienter under § 10(b) to the extent it reflects some degree of intentional or knowing misconduct." *Silicon Graphics,* 183 F.3d at 976-77.

## III.     Discussion

### A.     Standard for Violation Of Section 10(b) And Rule 10b-5

Section 10(b) makes it unlawful:

[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  In a typical section 10(b) or Rule 10b-5 private action, a plaintiff must prove: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005); *Stoneridge Investment Partners, LLC. v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008).

### B.     Plaintiffs Failed to Plead Scienter Adequately.

To adequately plead scienter under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The "required state of mind" is "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re Silicon Graphics*, 183 F.3d 970, 975 (9th Cir. 1999).  Plaintiffs must plead "at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness."  *In re Silicon Graphics*, 183 F.3d at 979.  To satisfy this pleading requirement,  "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless[,] false or misleading nature of the statements when made."  *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).  In addition, the Supreme Court recently

Initials of Deputy Clerk __sr__

described the appropriate method for determining if the "strong inference" requirement for alleging scienter had been met:

> It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). In deciding if scienter has been adequately pled, "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*, at 322-23 (2007) (citations omitted); *see, also, Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 987 (9th 2009) (holding that the Supreme Court's "decision in *Tellabs* does not materially alter the particularity requirements for scienter claims established in our previous decisions, but instead only adds an additional 'holistic' component to those requirements").

### 1. Plaintiffs Failed to Plead Particularized Allegations of Scienter Against the Individual Defendants

Plaintiff's allegations, when considered collectively, do not give rise to a strong inference of scienter. In fact, "there is a total absence of factual allegations that would permit a strong inference that" the Individual Defendants knew about Chan's illegal activities prior to the end of March 2012 or that any representations or statements they made with respect to ChinaCast "were false or misleading when made" or that the Individual Defendants "acted in deliberately reckless disregard of their truth or falsity." *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1089. Instead, the Complaint simply contains scattered and conclusory allegations that "Defendants," who are pled as an undifferentiated group, had "actual knowledge" or "acted with reckless disregard for the truth."[5] However, "[w]ithout corroborating facts, it is

---

[5] In their Opposition, and contrary to the allegations of the Complaint, Plaintiffs concede that the Individual Defendants did not have any actual knowledge of Chan's illegal activities prior to the Individual Defendants' discovery and disclosure of those activities in March and April of 2012. Instead, Plaintiffs' argue that the Individual Defendants were "deliberately reckless." However, the Ninth Circuit has held that "deliberate recklessness" is "a form of intentional or knowing misconduct." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). To adequately allege deliberate recklessness, "the plaintiff must plead a highly unreasonable

impossible to conclude that such allegations rest on anything more than hind-sight speculation." *Id.* (c*iting In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999)). Considering plausible opposing inferences, as required by *Tellabs*, the inference of scienter is not "as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. Moreover, the allegations do not satisfy the specificity requirement of Rule 9(b) or of the PSLRA. The allegations of the Complaint neither identify what roles each Individual Defendant played in the alleged fraud nor allege facts giving rise to a strong inference of scienter on the part of each Individual Defendant in any context. It is telling that Plaintiffs do not rely on confidential witnesses or specific internal reports to demonstrate what, if anything, the Individual Defendants knew or when they may have acquired that knowledge.

Plaintiffs' failure to allege specific facts with respect to the Individual Defendants' alleged knowledge is particularly problematic in this case because the misrepresentations and omissions relied on by Plaintiffs relate to an illegal scheme that Chan and his co-conspirators successfully concealed from them. *See, e.g., Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 746-47 (9th Cir. 2008) (holding that where misrepresentation claims related to illegal payments made by company's sales agents, such illegal activities did not give rise to an inference that the defendants were aware of them, but "to the contrary, the surreptitious nature of the transactions creates an equally strong inference that the payments would have deliberately been kept secret – even within the company"). In this case, Plaintiffs claim that scienter can be inferred because Sena, one of Chan's accomplices, told investors during a March 17, 2011 conference call that "nonrecurring, irregular" contracts would be vetted by the Board of Directors. According to Plaintiffs, "the Board turned a blind eye to at least one non-recurring, irregular contract" for a credit facility that was improperly and illegally

---

omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* Thus, "to plead reckless disregard, Plaintiffs must allege specific facts indicating a level of reckless disregard that strongly suggests actual intent." *Dean v. China Agritech, Inc.*, 2001 WL 5148598, *4 (C.D. Cal. Oct. 27, 2011). In this case, Plaintiffs have failed to plead any such facts. *See, e.g., New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) (holding that a plaintiff could allege fraud by pleading "in your face facts that cry out"). Plaintiffs' reckless disregard argument is also unpersuasive because the Complaint itself acknowledges that in December 2011 ChinaCast, based on media reports related to other Chinese companies, voluntarily retained FTI to perform an independent analysis of its cash position even though "no question or concern has been raised by the Company's auditors, audit committee, or any other relevant professional related to the Company's cash balances." FYI's analysis revealed that, as of June 30, 2011, ChinaCast had cash and cash equivalents totaling $132.1 million, or 98.5 percent of the total reported on its Form 10-Q for the same time period and that the remaining 1.5 percent discrepancy was attributable to the termination of one of ChinaCast's e-learning joint ventures. Therefore, the fact that ChinaCast sought and received independent verification of its cash position just a few months before the end of the putative class period negates any inference that the Individual Defendants or ChinaCast were deliberately reckless or acted with the requisite intent to defraud shareholders.

Initials of Deputy Clerk  _sr_

obtained by Chan and his co-conspirators, and which was not discovered by the Individual Defendants until after the end of the putative class period. Moreover, there are no allegations that Chan and his co-conspirators disclosed this illegal transaction to the Board of Directors, or any of the Individual Defendants.

### a. Plaintiffs' Allegations That ChinaCast Lacked Effective Internal Controls Do Not Give Rise to a Strong Inference of Scienter.

In their Complaint, Plaintiffs allege that ChinaCast's auditor, Deloitte, "warned the Board that serious internal control weaknesses existed." However, "allegations that Defendants had deficient internal controls during the class period does not create a strong inference that Defendants knowingly [made] false or misleading statements." *In re Loudeye Corp. Sec. Litig.*, 2007 WL 2404626, **7-8 (W.D. Wash. Aug. 17, 2007) (holding that allegations "[t]hat the controls were inadequate is perhaps an indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities fraud claim") (citation omitted). Therefore, without additional facts, "a lack of internal controls generally does not suffice to show scienter." *Communications Workers of America Plan for Employees' Pension and Death Benefits v. CSK Auto Corporation*, 2007 WL 2808652, *8 (D. Ariz. Sept. 27, 2007); *In re Hypercom Corp. Securities Litigation*, 2006 WL 1836181, *9 (D. Ariz. July 15, 2006) (holding that "the fact that Hypercom issued a press release recognizing a lack of effective internal controls, is not overly probative as to whether [defendant] intentionally misclassified the leases. Presumably every company that issues a financial restatement because of GAAP errors will cite as a reason lack of effective controls.").

In this case, Plaintiffs do not allege that Deloitte's advice was anything other than routine or that the warning was strong enough to warrant immediate action by the Individual Defendants. In *In re American Apparel, Inc. Shareholder Litigation*, 855, F. Supp. 2d 1043, 1083 (C.D. Cal. 2012), the Court found that the plaintiffs failed to adequately allege scienter when the defendant corporation's auditor, which also happened to be Deloitte, actually resigned from its assignment with the company because Deloitte was "no longer willing to rely on management's representations" and because it "believed that management had withheld crucial financial information and made misrepresentations." In their Complaint, Plaintiffs merely allege that Deloitte identified "inadequate resources" in ChinaCast's "finance team to meet the demands of rapidly expanded businesses which resulted in a delayed closing process" and a "lack of contemporaneous documentation of certain decisions made by the Board of Directors." If Deloitte's actions were insufficient to give rise to an inference of scienter in *In re American Apparel* where Deloitte actually resigned as the result of questioning management's representations, the far more generic allegations pled by Plaintiffs in this action simply fail to give rise to an inference of scienter.[6]

---

[6] Plaintiffs also allege that ChinaCast failed to follow GAAP because its publicly reported financial statements failed to include any reference to the illegal acts by Chan and other employees. However, "the mere publication of inaccurate accounting figures, or a failure to follow

### b.   The Individual Defendants' Corporate Positions Do Not Give Rise to a Strong Inference of Scienter.

Plaintiffs also allege that a strong inference of scienter can be demonstrated by the Individual Defendants' high-level positions within ChinaCast.  However, the Complaint alleges no facts that the Individual Defendants knew about Chan's illegal activities as a result of or because of their high level positions.[7]  Instead, the Complaint merely identifies each of the Individual Defendants' positions and periods of service and then generically alleges that members of the Audit Committee, which includes several of the Individual Defendants, had various responsibilities, including oversight of financial reporting.  However, the positions of various Individual Defendants within ChinaCast is insufficient, without more, to create a strong inference of scienter.  *See, e.g., In re Oak Tech. Sec. Litig.*, 1997 WL 448168, at *11 (N.D. Cal. Aug.1, 1997) (holding that allegations of knowledge based on positions within a company are "insufficient to establish [defendants'] liability for alleged misstatements"); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) (holding that "[g]eneralized imputations of knowledge do not suffice, regardless of the defendants'

---

GAAP, without more, does not establish scienter."  *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal. 2009) (*quoting DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002)).  In this case, Plaintiffs have not offered any facts suggesting that any of the Individual Defendants were aware of any problems or issues with ChinaCast's financial reporting.  "Scienter requires more than a misapplication of accounting principles."  *Id.* at 1185-86 ("Defendants' GAAP violations just as likely support an inference that [defendants] acted with scienter as an inference of innocent and unknowing behavior").

[7]   In alleging that the Individual Defendants had knowledge of Chan's illegal activities, Plaintiffs rely heavily on a statement made by ChinaCast in July 2012, months after the end of the putative class period, that based on a review of bank statements from 2011 and 2012, it appeared there had been a series of "readily identifiable" inflows and outflows of cash related to Chan's illegal activities.  However, the Ninth Circuit has held that plaintiffs must include "detailed and specific allegations about management's exposure to factual information within the company."  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).  In this case, Plaintiffs fail to allege that any of the Individual Defendants received, had access to, or were even aware of the bank statements during the putative class period when Chan was committing his illegal acts.  *See, e.g., In re Daou Systems, Inc.*, 411 F.3d 1006, 1022-23 (9th Cir. 2005) (upholding a compliant based on "specific admissions from top executives that . . . they monitored portions of the company's database" that was the subject of the allegedly false statements).  Although not alleged in their Complaint, Plaintiffs argue in their Opposition that the Individual Defendants should have known about Chan's illegal activities based on the 2011 proxy litigation because during that proxy litigation Sherwood characterized efforts by Chan and others to acquire ChinaCast as an "improper process."  However, Plaintiffs fail to explain how this vague characterization should have placed the Individual Defendants on inquiry notice that Chan was looting ChinaCast.  In addition, as discussed above, the Individual Defendants conducted additional due diligence on ChinaCast's cash position for unrelated reasons in late 2011, but that investigation did not uncover the illegal activities at that time.

positions within the company") (citation omitted).

In addition, Plaintiff's bare allegations that various of the Individual Defendants were members of various committees, such as the audit committee, are insufficient to demonstrate a strong inference of scienter. *See, e.g. In re Lockheed Martin Corp. Sec. Litig.*, 272 F.Supp.2d 944, 956 (C.D. Cal. 2003) (dismissing complaint and finding that plaintiff had failed to allege scienter because "asserting that the men are members of Lockheed's executive committee, without describing the duties of the committee or how these defendants participated in it, does not demonstrate active involvement in day-to-day operations"). Therefore, Plaintiffs "must do more than allege that . . . key officers had the requisite knowledge by virtue of their 'hands on' positions; a ruling to the contrary would eliminate the necessity for specially pleading scienter as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position." *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 844 (N.D. Cal.2000) (internal quotations and citation omitted). Plaintiffs have failed to allege any specific facts that would tend to establish the Individual Defendants' knowledge of Chan's illegal activities or provide an adequate description of the activities and responsibilities of the Individual Defendants on the audit committee that might demonstrate deliberate recklessness in failing to discover Chan's illegal activity.

### c. The Lack of Stock Sales Negates Any Inference of Scienter.

Even if Plaintiffs had alleged facts that might be sufficient to give rise to a strong inference of scienter, a strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (holding that despite sales of $84 million in shares, the defendants still retained such a large percentage of their holdings – 92 percent – that an inference of scienter was functionally negated); *In re Silicon Graphics*, 183 F.3d at 987-88 (no scienter where despite over $13.8 million in stock sales, the defendants still retained over 90 percent of their holdings; *In re Wet Seal, Inc. Sec. Litig.*, 518 F.Supp. 2d 1148, 1177-78 (C.D. Cal. 2007) ("while allegations of insider sales are not required in securities fraud cases, the lack of *any* tangible, personal benefit here further weighs against the Officer Defendants having scienter") (internal citations omitted).

In this case, assuming Plaintiffs had adequately pled scienter (which they have not), any inference of scienter is convincingly negated by the lack of stock sales by the Individual Defendants during the class period. In fact, not a single Individual Defendant sold any shares of stock during the putative class period, notwithstanding Plaintiffs' claims that the Individual Defendants knew that ChinaCast's stock was artificially inflated during that time period. In fact, one of the Individual Defendants, Sherwood, purchased more than 2.7 million shares during the putative class period. Therefore, the substantial losses suffered by the Individual Defendants due to their failure to sell any stock during the class period sufficiently negates any inference of scienter that may have been raised by other allegations of the Complaint. *Tripp v. Indymac Financial Inc.*, 2007 WL 4591930, *4 (C.D. Cal. Nov. 29, 2007) (holding that "the Individual Defendants retained such a large percentage of their stock that an inference of

Initials of Deputy Clerk ___sr___

scienter is functionally negated"); *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992) (holding that "if we were to conclude that the [defendants] meant to defraud investors, we would have to believe that they did it for the sheer joy of it rather than for profit").

### 2. Plaintiffs Failed to Sufficiently Allege Scienter Against ChinaCast

Plaintiffs' claims against ChinaCast must also be dismissed because Plaintiffs have failed to plead scienter. Although a corporation does not have a "mental state," for purposes of determining scienter in the securities litigation context, "it is a well settled principle that knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority, is imputed to the corporation itself."[8] *In re Turbodyne Tech., Inc. Sec. Litig.*, 2000 WL 33961193, at *16 n. 115 (C.D. Cal. Mar. 15, 2000) (*quoting Acme Precision Prods., Inc. v. Am. Alloys Corp.*, 422 F.2d 1395, 1398 (8th Cir. 1970)).

However, under the adverse interest exception to the general rule of imputation, "the knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation." *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 225, 232 (D.N.J. 2000). The adverse interest exception is derived from general principals of agency law. As the Court in *Cedant* held:

> The rule that knowledge or notice on the part of the agent is to be treated as notice to the principal is founded on the duty of the agent to communicate all material information to his principal, and the presumption that he has done so. But the legal presumptions ought to be logical inferences from the natural and usual conduct of men under the circumstances. But no agent who is acting in his own antagonistic interest, or who is about to commit a fraud by which his principal will be affected, does in fact inform the latter, and any conclusion drawn from a presumption that he has done so is contrary to all experience of human nature.

*Cendant*, 109 F. Supp. 2d at 232 (*quoting In re Jack Greenberg Court*, 212 B.R. 76, 84 (Bankr. E.D. Pa. 1997)). Courts routinely invoke this principle in refusing to impute scienter from the fraud of a rogue agent. *See, e.g., Cendant*, 109 F. Supp. 2d at 233 (denying summary judgment in securities fraud case because "no record has yet been developed as to whether the fraud was conducted for [the employee's] personal benefit or that of the corporation. The possibility of adverse interests between the guilty employees and the

---

[8] In the Ninth Circuit, scienter may only be imputed from corporate officials who actually made a challenged statement. *See In re Apple Computer, Inc., Securities Litigation*, 243 F. Supp. 2d 1012, 1023-24 (N.D. Cal. 2002) (*citing Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435-36 (9th Cir. 1995)).

Initials of Deputy Clerk  _sr_

corporation remains open"); *F.D.I.C. v. Lott*, 460 F.2d 82, 88 (5th Cir. 1972) (where bank president "fraudulently dealt with the bank in his own interest, he is deemed to have an adverse interest and the knowledge possessed by him [of his own fraudulent acts] in the transaction is not imputable to the bank"); *Alpern v. Utilicorp United, Inc.*, 1994 WL 682861, at *3 (W.D. Mo. Nov. 14, 1994) (declining to impute knowledge for purposes of Section 10(b) claim because "the knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation") (*quoting Kaplan*, 9 F.3d at 407).

Under the adverse interest exception, dismissal of the corporation from a securities fraud action is warranted where the only corporate agent who may supply the requisite scienter was acting completely adversely to the Company's interests. To determine whether to impute scienter from a corporate agent, Courts look "to whether [the] executive's fraud operates to benefit the company or whether the fraud is committed against the company." *In re JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) (dismissing JPMorgan Chase from the action and holding that the plaintiffs' allegations that the CEO agreed to remain as CEO "for two years in exchange for a 14 percent premium against JPMC in the merger clearly did not benefit the company. In fact, the allegations suggest that [the CEO] enriched himself at the expense of the corporate entity").

In this case, there is no allegation that Chan or his accomplices acted out of anything other than their own self-interest, or that their conduct in any way benefitted ChinaCast. In fact, "Courts have typically found that an agent who uses his office to loot corporate assets has acted adversely to his principal." *See In re National Century Finance Entertainment, Inc.*, 783 F.Supp. 2d 1003, 1016 (S.D. Ohio 2011); *USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F.Supp. 2d 1210, 1219 (D. Nev. 2011) ("The 'classic example' of an agent acting adversely to his principal is where an agent embezzles from or loots his principal"). Therefore, any knowledge or intent on the part of Chan and his accomplices cannot be properly imputed to ChinaCast. As a result, Plaintiffs have failed to allege scienter against ChinaCast.[9]

## B.    Violation of Section 20(a)

---

[9] Plaintiffs argument that Chan and Sena's fraudulent intent may be imputed to ChinaCast because of the "sole actor" exception to the adverse interest rule is unpersuasive. The sole actor exception applies when "the agent is the sole representative of the principal corporation," and, thus, applies in cases where "the wrongdoer was also the corporate principal's sole shareholder or when all the corporation's management participated in the wrongdoing," or there was otherwise no "innocent insider [that] could and would have exercised corporate authority to stop the fraud." *USACM*, 764 F. Supp. 2d at 1219-21. Chan and Sena were clearly not ChinaCast's only shareholders or its sole representatives. In addition, Plaintiffs do not allege, nor could they, that all of ChinaCast's management and shareholders were involved in Chan's illegal activities. In fact, Plaintiffs, who are shareholders themselves, admit that they were unaware of the illegal activities, and they concede that the Individual Defendants had no knowledge of those activities.

To state a claim under Section 20(a), a plaintiff must allege (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). As discussed above, Plaintiff has failed to state a claim for a primary violation of the securities law. Accordingly, Plaintiffs second claim for relief for violation of Section 20(a) must be dismissed as to each of the Individual Defendants.

## IV.    Conclusion

For all the foregoing reasons, Defendants' Motion is **GRANTED**. The Complaint is **DISMISSED without leave to amend** as to each of the Defendants, and this action is **DISMISSED with prejudice** as to each of the Defendants.[10]

IT IS SO ORDERED.

---

[10]  Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir.1995). When amendment would be futile, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir.1996). In this case, Plaintiffs request leave to amend, but fail to offer any additional facts that could be alleged in an amended complaint. Such a failure is a strong indication that Plaintiffs have no additional facts to plead. *See, Silicon Graphics*, 183 F.3d at 991 (denying leave to amend where plaintiff failed to offer additional facts which might cure defects in complaint); *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir.1993) (same). In addition, Plaintiffs had the opportunity to plead additional facts from those alleged in their original complaint when they filed the consolidated complaint. Moreover, "dismissal with prejudice is necessary to promote the goal of the PSLRA, which is to 'raise the pleading standards to eliminate abusive securities litigation.'" *Id.* (*quoting Silicon Graphics*, 183 F.3d at 977). Accordingly, leave to amend is denied.

Initials of Deputy Clerk  sr

**<u>Exhibit 2</u>**

**<u>Ninth Circuit Decision</u>**

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE CHINACAST EDUCATION CORPORATION SECURITIES LITIGATION, | No. 12-57232 |
| | D.C. No. 2:12-cv-04621-JFW-PLA |
| COSTA BRAVA PARTNERSHIP III LP, individually and on behalf of all other persons similarly situated, *Plaintiff-Appellant*, | |
| | OPINION |
| v. | |
| CHINACAST EDUCATION CORPORATION; NED SHERWOOD; STEPHEN MARKSCHEID; DEREK FENG; DANIEL TSEUNG, *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
April 7, 2015—Pasadena, California

Filed October 23, 2015

Before: Stephen Reinhardt, M. Margaret McKeown,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Securities Fraud

Reversing the dismissal of a securities fraud claim, the panel held that a CEO's fraud could be imputed to his corporate employer, even though his alleged embezzlement and misleading of investors through omissions and false statements were adverse to the company's interests.

Taking the allegations in the complaint as true, the panel agreed with the Third Circuit and concluded that the CEO's fraudulent misrepresentations—and, more specifically, his scienter or intent to defraud—could be imputed to the company because the CEO acted with apparent authority on behalf of the company, which placed him in a position of trust and confidence and controlled the level of oversight of his handling of the business.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Jeremy A. Lieberman (argued), Marc I Gross, and Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom & Gross, LLP, New York, New York; Patrick V. Dahlstrom, Pomerantz Grossman Hufford Dahlstrom & Gross, LLP, Chicago, Illinois; Laurence M. Rosen, The Rosen Law Firm, P.A., Los Angeles, California; Philip Kim, The Rosen Law Firm, P.A., New York, New York, for Plaintiff-Appellant.

William G. McGuinness (argued), Israel David, and Adam M. Harris, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, New York, for Defendants-Appellees.

## OPINION

McKEOWN, Circuit Judge:

Under Rule 10b-5 of the Securities Exchange Act of 1934, "it is unlawful for 'any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact' in connection with the purchase or sale of securities." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 (2011) (alteration in original) (quoting 17 CFR § 240.10b-5(b)). Both parties agree such deception occurred in this case: ChinaCast founder and CEO Ron Chan embezzled millions from his corporation and misled investors through omissions and false statements—textbook securities fraud. The sole question on appeal is a purely legal one and an issue of first impression in this circuit: Can Chan's fraud be imputed to ChinaCast, his corporate employer, even though Chan's looting of the corporate coffers was adverse to ChinaCast's interests? Taking the allegations in the

4        IN RE CHINACAST EDUC. CORP. SEC. LITIG.

complaint as true, we conclude that Chan's fraudulent
misrepresentations—and, more specifically, his scienter or
intent to defraud—can be imputed to ChinaCast.
Significantly, imputation is proper because Chan acted with
apparent authority on behalf of the corporation, which placed
him in a position of trust and confidence and controlled the
level of oversight of his handling of the business. We reverse
the district court order dismissing the complaint under
Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND

The facts are drawn from Costa Brava's complaint, which
we accept as true for purposes of the Rule 12(b)(6) motion to
dismiss. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992,
998 (9th Cir. 2010). ChinaCast, founded in 1999, is a for-
profit postsecondary education and e-learning services
provider that sells distance learning and "multimedia
education content" over the Internet and from three campuses
in China. Before its abrupt downfall, ChinaCast boasted a
market capitalization topping $200 million and was listed on
the NASDAQ Global Select Market. ChinaCast's stock
offerings in the United States in 2008 and 2009 generated $48
million in net proceeds.

In its March 2011 Form 10-K filing with the Securities
and Exchange Commission ("SEC"), ChinaCast disclosed
that its outside accounting firm Deloitte Tohmatsu CPA Ltd.
(an affiliate of Deloitte & Touche LLP) ("Deloitte") had
identified "serious internal control weaknesses" with respect
to its financial oversight. The complaint alleged that, despite
this "clear warning from Deloitte" regarding its lax financial
oversight, the company and its board "turned a blind eye" to
the problem.

Soon after, the complaint alleges, ChinaCast's founder and CEO, Ron Chan Tze Ngon ("Chan"), looted the company's coffers, including proceeds from the U.S. stock offerings. From June 2011 through April 2012, Chan "transferred" $120 million of corporate assets to outside accounts that were controlled by him and his allies. In addition, Chan permitted a company vice president to move $5.6 million in company funds to his son; "unlawfully transferred control" of two of ChinaCast's private colleges outside the company; and pledged $37 million in company assets to secure third-party loans unrelated to ChinaCast's business. These actions brought ChinaCast to financial ruin. The company cannot even afford its legal bills, according to its lawyers, who submitted a bare-bones brief on appeal and stated that "ChinaCast now unfortunately lacks the funds necessary to mount with full vigor the defense of this appeal."

In the midst of this fraud on multiple fronts, Chan and ChinaCast Chief Financial Officer Antonio Sena participated in a series of earnings calls and other communication with investors. During these calls, neither official disclosed the fraudulent activities taking place; instead, Chan emphasized the company's financial health and stability. For example, in a press release and conference call in fall 2011, Chan reassured investors that "no questions or concern[s] have ever been raised by the company's auditors or audit committee about our cash balances." Throughout 2011, Chan signed SEC filings on behalf of ChinaCast and never disclosed the $120 million in transfers and other fraudulent activities afoot.

In early 2012, ChinaCast's board discovered that Chan had attempted to interfere with an annual audit. The board removed him as chairman and CEO on March 26, 2012, and Sena resigned the next day. Beginning in April 2012,

6          IN RE CHINACAST EDUC. CORP. SEC. LITIG.

ChinaCast disclosed in a series of SEC forms that it had "uncovered questionable activities" and illegal conduct on the part of its senior officers.

In September 2012, a group of ChinaCast shareholders who bought stock between February 2011 and April 2012 ("the shareholders") brought this federal securities lawsuit, alleging that ChinaCast, Chan, Sena, and the company's independent directors violated Rule 10b-5 of the Securities Exchange Act of 1934.

The district court dismissed the complaint with prejudice under Rule 12(b)(6).[1]  With respect to the claim against ChinaCast, the court concluded that the shareholders failed to plead scienter—a bedrock requirement of Rule 10b-5. Although the actions of corporate agents usually are imputed to the corporate entity, the district court noted that under the "adverse interest exception," courts "refus[e] to impute scienter from the fraud of a rogue agent."  In this case, "there is no allegation that Chan or his accomplices acted out of anything other than their own self-interest, or that their conduct in any way benefitted ChinaCast."  Because Chan acted adversely to ChinaCast's interests, the district court concluded that Chan's scienter or intent to defraud could not be imputed to the corporation.  The shareholders therefore failed to allege scienter as against the corporation.

---

[1] The shareholders only appeal their claim against ChinaCast.  Chan and Sena reside outside the United States and, according to the shareholders, have evaded service of process.  The district court dismissed the claims against ChinaCast's independent directors because of a lack of scienter. The shareholders do not challenge that aspect of the ruling.

## ANALYSIS

Federal securities law, embodied in the Securities Act of 1933 and the Securities Exchange Act of 1934, "create[s] an extensive scheme of civil liability," which encompasses not only SEC enforcement actions but a private right of action implied by the terms of § 10(b) of the 1934 Act. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994). These private suits serve the "animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence." *United States v. O'Hagan*, 521 U.S. 642, 658 (1997); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("The securities statutes seek to maintain public confidence in the marketplace. They do so by deterring fraud, in part, through the availability of private securities fraud actions." (internal citation omitted)). Such suits, however, are a double-edged sword, because they also can breed abusive litigation and "impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). To balance these competing forces, and "[a]s a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995," or PSLRA. *Id.* The PSLRA, among other things, imposes "[e]xacting pleading requirements" that require "plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)). Plaintiffs must show a "strong inference" of scienter to survive a motion to dismiss. 15 U.S.C. § 78u-4(b)(2)(A).

8       IN RE CHINACAST EDUC. CORP. SEC. LITIG.

The scienter requirement is at the center of this appeal.[2] To be sure, CEO Chan possessed the requisite scienter, or intent to defraud. ChinaCast itself describes Chan's dealings as a "massive scheme . . . to loot the Company of its most valuable assets," which wrought "catastrophic" damage.[3] The question is whether Chan's scienter can be imputed to his corporate employer, ChinaCast. We review de novo this legal question that underlies the Rule 12(b)(6) dismissal. *N. Cnty. Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738, 741 (9th Cir. 2009).

Section 10(b) and Rule 10b-5 can be violated by any "person," natural or legal, including corporations. *See* 15 U.S.C. § 78c(a)(9) (defining *person* under the Securities Exchange Act to include corporations); *see also Cent. Bank of Denver, N.A.*, 511 U.S. at 191 ("Any person or entity…may be liable as a primary violator under 10b-5."). Of course a corporation "can only act through its employees and agents" and can likewise only have scienter through them. *See Suez Equity Investors, L.P. v. Toronto-Dominion*

---

[2] "The elements of a private action under Rule 10b–5 are '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Janus*, 131 S. Ct. at 2301 n.3 (quoting *Stoneridge Inv. Part., LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

[3] Chan is a Chinese national who resides in China. In 2013, the SEC brought civil charges against Chan in the United States District Court for the Southern District of New York. Final judgment was entered against Chan, barring him from the securities industry and requiring him to pay $41.4 million in disgorgement, $6.65 million in interest, and a $750,000 civil penalty. *SEC v. Chan Tze Ngon*, No. 13-civ-6828 TPG, Dkt. No. 29 (S.D.N.Y. Jan. 16, 2015).

*Bank*, 250 F.3d 87, 101 (2d Cir. 2001). Because the Securities Exchange Act and accompanying regulations do not contain any explicit instructions on when an employee's acts and intent are to be imputed as those of the company, courts have looked to agency principles for guidance.[4] *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990) (en banc) (noting that the Exchange Act's explicit provision for

---

[4] There is, of course, no federal common law of agency that governs claims brought *under state law* in federal court. *See O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 83 (1994). We are called on here, however, to decide if ChinaCast is (alleged to be) a primary violator of § 10(b). That is we must define "the scope of conduct prohibited by § 10(b), [and thus] the text of the statute controls our decision." *Cent. Bank of Denver, N.A.*, 511 U.S. at 173. Accordingly this is a question of federal securities law, albeit one guided by (common law) agency principles. In fact, scienter itself, though an element of state common law fraud, is required only because of the way the Supreme Court read § 10(b). *See Ernst & Ernst*, 425 U.S. at 196–97.

Similarly, in *American Society of Mechanical Engineers*, the Supreme Court treated the issue we deal with here—imputation—as a question of interpreting the Sherman Act with guidance from agency principles, not a question of agency law in the state (New York) where the Society of Mechanical Engineers was incorporated. *See Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565–66 (1982); *see also Dark v. United States*, 641 F.2d 805 (9th Cir. 1981) (interpreting federal income tax law using agency principles); *but see Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494 (3d Cir. 2013) (concluding imputation under the Exchange Act is a question of state law).

We also note that there does not appear to be a substantive difference between the general common law of agency on this question and that applied in Delaware, where ChinaCast was incorporated and whose law would presumably govern if state law applied. The parties have likewise addressed their briefing to general agency law rather than that of a particular state. We conclude that our analysis would not be any different if state law controlled.

10      IN RE CHINACAST EDUC. CORP. SEC. LITIG.

secondary liability, §20(a), "was not intended to supplant the application of agency principles in securities cases") (internal quotation omitted).

Under the rule of imputation, it is "fundamental that an employer is liable for the torts of his employee committed while acting in the scope of his employment." *Fields v. Synthetic Ropes, Inc.*, 215 A.2d 427, 432 (Del. 1965); *see also Belmont*, 708 F.3d at 494 ("[T]he imputation doctrine recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority.") (internal citation omitted) (alteration in original). The rule exists for good reason: "Imputation creates incentives for a principal to choose agents carefully and to use care in delegating functions to them." Restatement (Third) of Agency § 5.03 cmt. b (2006).

In the context of Rule 10b-5, we have adopted the general rule of imputation and held that a corporation is responsible for a corporate officer's fraud committed "within the scope of his employment" or "for a misleading statement made by an employee or other agent who has actual or apparent authority." *Hollinger*, 914 F.2d at 1577 n.28. Other courts follow the same principles, even after the advent of the PSLRA and its strict focus on scienter: "The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106–07 (10th Cir. 2003) (collecting cases); *see also Makor Issues & Rights Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008) ("The doctrines of respondeat superior and apparent authority remain applicable to suits for securities

fraud."); *Snowstorm Acquisition Corp. v. Tecumseh Prod. Co.*, 739 F. Supp. 2d 686, 706 (D. Del. 2010) (same with respect to Delaware corporation).

In the face of these well-established parameters, ChinaCast does not dispute that Chan acted within the scope of his apparent authority. Nevertheless, the corporation argues that the ordinary rule of imputation is inapposite because of the common law's so-called "adverse interest exception." Under that exception, a rogue agent's actions or knowledge are "not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person." Restatement (Third) of Agency § 5.04 (2006); *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1205 (Del. 2015) ("[T]he adverse interest doctrine may prevent a court from imputing knowledge of wrongdoing to an employer when the employee has totally abandoned the employer's interests, such as by stealing from it or defrauding it.").

So far, so good for ChinaCast—unquestionably Chan lined his own pockets at the expense of ChinaCast's interests. But herein lies the rub: ChinaCast's formulation ignores that the adverse interest rule doesn't apply in every instance where there is a faithless fraudster within the corporate ranks. Specifically, the very same Restatement provision that sets out the adverse interest exception also provides: "Nevertheless, notice is imputed . . . when necessary to protect the rights of a third party who dealt with the principal in good faith." Restatement (Third) of Agency § 504 (2006); *see also Jensen v. IHC Hosps., Inc.*, 82 P.3d 1076, 1091 n.13 (Utah 2003) ("Although typically an agent's knowledge will not be imputed to its principal when an agent is involved in

12       IN RE CHINACAST EDUC. CORP. SEC. LITIG.

fraud or other adverse dealings, an exception exists for innocent third parties."); *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 891 (Del. Ch. 2009) *aff'd sub. nom. Teacher's Ret. Sys. of Louisiana v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010) (even when the adverse interest exception applies, "the corporation…[remains] responsible to innocent third parties and the polity for any offense to them"); *cf.* Restatement (Second) of Agency § 262 & cmt. a (1958) (explaining how apparent authority protects third-party reliance). In other words, there is an exception to the exception: the adverse interest rule collapses in the face of an innocent third party who relies on the agent's apparent authority.

The interplay between these principles has been explained as follows:

> The starting point is that all information known by the agent, at least when received within the scope of authority, is deemed known by the principal. But this is not so if the agent is acting contrary to the principal's interests—the so-called "adverse interest" exception. In turn, the adverse interest exception itself has an exception: the principal is charged with even the faithless agent's knowledge when an innocent third-party relies on representations made with apparent authority.

Donald C. Langevoort, *Agency Law Inside the Corporation: Problems of Candor and Knowledge*, 71 U. Cin. L. Rev. 1187, 1214 (2003).

IN RE CHINACAST EDUC. CORP. SEC. LITIG.    13

In short, parsing the common law in context—looking to both the adverse interest exception and its imbedded caveats that are essential to cabining its scope—compels the conclusion that Chan's scienter can be imputed to the corporation in these circumstances. Restatement (Third) of Agency § 5.04 cmt. b (2006) (noting that adverse interest rule and its exceptions work together "as a whole" so that the "doctrine reflects a balance among factors that, if pressed in isolation to their respective extremes, would lead to divergent outcomes"). The complaint alleges that third-party shareholders understandably relied on Chan's representations, which were made with the imprimatur of the corporation that selected him to speak on its behalf and sign SEC filings.

Although a question of first impression in this circuit, case law from other courts confirms that imputation is proper even in the face of Chan's double dealing. The Third Circuit recently confronted the same issue in the case of an investment adviser who perpetrated a Ponzi scheme, diverting $20 million of client funds to finance his lavish lifestyle. *Belmont*, 708 F.3d at 479. Defrauded clients sued the corporate employer, MB Investment Partners, Inc., for fraud under Rule 10b-5. *Id.* at 494. Just like ChinaCast, the corporation invoked the adverse interest exception. The Third Circuit rejected that argument and held that imputation is appropriate when an employee acts within his actual or apparent authority. Significantly, the court held that "a swindler may still act with apparent authority, even if he is acting for his own benefit." *Id.* at 496 (citation omitted). The court noted that the "underlying purpose of imputation" is "fair risk-allocation, including the affordance of appropriate protection to those who transact business with corporations." *Id.* Hence, when a corporate officer commits wrongdoing, the "principal who has placed the agent in the position of trust

and confidence should suffer, rather than an innocent stranger." *Id.* at 494–95 (internal citation omitted); *see id.* at 497.

In the same vein, in the federal antitrust context, the Supreme Court endorsed the identical principle of imputation: "[A] principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agents acts with apparent authority." *Mech. Eng'rs*, 456 U.S. at 566. According to the Court, imputation and the corresponding threat of civil liability give an employer greater incentive to "see to it that [its] agents abide by the law" and "take systematic steps" to prevent misconduct. *Id.* at 572–73 (internal citation omitted) (alteration in original). Although *Mechanical Engineers* is an antitrust case, its reasoning is not limited to that context. The Supreme Court explained that the "[a]pparent authority theory has long been the settled rule in the federal system" and cited *Gleason v. Seaboard Air Line Ry. Co.*, 278 U.S. 349 (1929), a railroad tort case. *Mech. Eng'rs*, 456 U.S. at 567–68. Significantly, the Supreme Court cited two Rule 10b-5 securities cases, among others, in noting that "[i]n a wide variety of areas, the federal courts, like this court in Gleason, have imposed liability upon principals for the misdeeds of agents acting with apparent authority." *Id.* at 568.

ChinaCast and the district court cite to several district court decisions that invoke the adverse interest exception. *See In re Rent-Way Sec. Lit.*, 209 F. Supp. 2d 493, 522 (W.D. Penn. 2002); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 225, 232–34 (D. N.J. 2000). These cases are hardly illuminating, however, because they do not address the relationship between the adverse interest exception and third-party reliance and apparent authority. In contrast, other

district courts have invoked apparent authority to override the adverse intent exception, including a Rule 10b-5 case involving Dennis Kozlowski's infamous looting of Tyco. *In re Tyco Int'l, Ltd.*, 2004 WL 2348315, No. MDL 02-1335-B, 02-266-B, at *6 (D. N.H. Oct. 14, 2004) (holding that the "adverse interest exception is inapplicable when a corporate officer or director makes a material misstatement or omission to an innocent third party while acting with the apparent authority of the corporation for whom he works"); *see also Puskala v. Koss Corp.*, 799 F. Supp. 2d 941, 944, 947 (E.D. Wis. 2011) (holding corporation liable for its vice president's embezzlement of more than $30 million from the company to purchase designer clothing, jewelry, furs, and other items even though she "committ[ed] fraud against the company rather than on behalf of it" because she acted with apparent authority by signing the corporation's SEC filings).

In the circumstances of this case, imputation also comports with the public policy goals of both securities and agency law—namely, fair risk allocation and ensuring close and careful oversight of high-ranking corporate officials to deter securities fraud. *See Belmont*, 703 F.3d at 494–95 (noting that the "principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger" (internal citation omitted)); *see also Broudo*, 544 U.S. at 345; *State Farm Fire and Cas. Co. v. Sevier*, 537 P.2d 88, 96 (Or. 1975) ("[O]ne who selects an agent and delegates authority to him should incur the risks of the agent's infidelity or want of diligence rather than innocent third persons.").

According to the complaint, which governs our analysis at this early procedural stage, ChinaCast received an audit from Deloitte in 2011 detailing "material internal control

weaknesses." Yet the corporation and its board "turned a blind eye" and failed to take significant action or heighten oversight. Had they done so, they may have prevented much of the decimation of ChinaCast's bottom line and share value. Indeed, the $120 million in illicit withdrawals began several months after the Deloitte report was issued. What's more, Chan was hardly a random corporate bureaucrat or mid-level manager. He was ChinaCast's founder and CEO, the one person on whom the board undoubtedly should have kept close tabs. *See In re Fin. Mgmt.*, 784 F.3d 29, 31–32 (1st Cir. 1986) (noting courts have applied apparent authority rule against corporations "particularly when the person making the misrepresentation is an important corporate official"). Permitting imputation under these circumstances encourages appropriate corporate oversight.

According to the complaint, both Chan and Sena knowingly misrepresented ChinaCast's financial condition. Because we conclude that their scienter can be imputed to ChinaCast for those material misrepresentation or omissions made within the scope of their apparent authority, the shareholders pled sufficient allegations to support imputation and survive the pleading requirements of the PSLRA. Of course, whether these allegations will materialize as admissible facts remains to be seen.

In closing, we note that at the pleading stage, a key inquiry in § 10(b) and Rule 10b-5 cases is whether the complaint sufficiently alleges scienter attributable to the corporation. A threshold question is whether the pleadings

support application of the adverse interest rule at all.[5] Assuming a well-pled complaint, we recognize that, as a practical matter, having a clean hands plaintiff eliminates the adverse interest exception in fraud on the market suits because a bona fide plaintiff will always be an innocent third party. The gymnastic exercise of imposing a general rule of imputation followed by analyzing the applicability of the exception to the exception becomes unnecessary. Of course, as the litigation proceeds, whether the plaintiff is an innocent third party and whether the presumption of reliance is rebutted[6] remain open questions. This approach, which takes an appropriately narrow view of the adverse interest exception, is consistent with the purpose of the securities laws to deter fraud and promote confidence in the securities markets.

The district court's order dismissing this case with prejudice under Rule 12(b)(6) is **REVERSED**.

---

[5] *In re Petrobras Sec. Litig.*, No. 14-CV-9662 JSR, 2015 WL 4557364, at *12 (S.D.N.Y. July 30, 2015) (rejecting the adverse interest exception defense because "the allegations…do not conclusively establish that the company received no benefit from the Corrupt Executives' actions").

[6] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) (reaffirming in a fraud on the market suit "the rebuttable presumption of reliance, rather than providing direct reliance on a misrepresentation").

**Exhibit 3**

**List of
20 Largest Unsecured Creditors, Excluding Insiders**

| Creditor Name and Address | Basis for Claim | Contingent, Unliquidated or Disputed (C,U,D) | Amount of Claim |
|---|---|---|---|
| Fried Frank Harris Shriver & Jacobson<br>One New York Plaza<br>New York, NY 10004 | Professional fees | | $5,996,483.00 |
| Fir Tree Value Master Fund, LP<br>55 West 46th Street<br>29th Floor<br>New York, NY 10036 | 2011 Proxy costs | Contingent | $1,500,000.00 |
| Fir Tree Value Master Fund, LP<br>55 West 46th Street<br>29th Floor<br>New York, NY 10036 | Unpaid interest on loan to company for payment of surety for Hong Kong Litigation | | $1,098,187.00 |
| Ashford Capital Partners LP<br>1 Walker's Mill Road<br>Wilmington, DE 19807 | Unpaid interest on loan to company for payment of surety for Hong Kong Litigation | | $584,608.00 |
| Norton Rose Fulbright<br>Hong Kong<br>1 Connaught Road<br>38/F Jardine House<br>Central Hong Kong | Professional fees | | $500,000.00 |
| Columbia Pacific Opportunity Fund LP<br>1910 Fairview Avenue E<br>Suite 200<br>Seattle, WA 98102 | CVR Priority Return December 2015 | Contingent | $450,000.00 |
| Columbia Pacific Opportunity Fund LP<br>1910 Fairview Avenue E<br>Suite 200<br>Seattle, WA 98102 | CVR Priority Return June 2016 | Contingent | $450,000.00 |

| | | | |
|---|---|---|---|
| Fir Tree Value Master Fund, LP<br>55 West 46th Street<br>29th Floor<br>New York, NY 10036 | CVR Priority Return June 2016 | Contingent | $378,000.00 |
| Columbia Pacific Opportunity Fund LP<br>1910 Fairview Avenue E<br>Suite 200<br>Seattle, WA 98102 | Unpaid interest on loan to company for payment of surety for Hong Kong Litigation | | $356,667.00 |
| MRMP Managers LLC<br>151 Terrapin Point<br>Vero Beach, FL 32963 | CVR Priority Return June 2016 | Contingent | $300,000.00 |
| Fir Tree Value Master Fund, LP<br>55 West 46th Street<br>29th Floor<br>New York, NY 10036 | CVR Priority Return December 2015 | Contingent | $276,000.00 |
| Special Situations Fund III QP LP<br>527 Madison Avenue<br>26th Floor<br>New York, NY 10022 | Unpaid interest on loan to company for payment of surety for Hong Kong Litigation | | $272,000.00 |
| Lake Union Capital Fund LP<br>714 3rd Street South<br>Kirkland, WA 98033 | Unpaid interest on loan to company for payment of surety for Hong Kong Litigation | | $256,197.00 |
| Park Financial Corporation<br>Jeff Swanson<br>4300 East Fifth Avenue<br>Columbus, OH 43219 | CVR Priority Return June 2016 | Contingent | $225,000.00 |
| Park Financial Corporation<br>Jeff Swanson<br>4300 East Fifth Avenue<br>Columbus, OH 43219 | CVR Priority Return December 2015 | Contingent | $225,000.00 |

| | | | |
|---|---|---|---|
| Anvil Investment Associates LP<br>1 Walker's Mill Road<br>Wilmington, DE<br>19807 | Unpaid interest on loan to company for payment of surety for Hong Kong Litigation | | $213,333.00 |
| Fir Tree Value Capital Opportunity Master Fund LP<br>55 West 46th Street, 29th Floor<br>New York, NY 10036 | Unpaid interest on loan to company for payment of surety for Hong Kong Litigation | | $194,239.00 |
| MRMP Managers LLC<br>151 Terrapin Point<br>Vero Beach, FL 32963 | CVR Priority Return December 2015 | Contingent | $180,000.00 |
| MRMP Managers LLC<br>151 Terrapin Point<br>Vero Beach, FL 32963 | Unpaid interest on loan to company for payment of surety for Hong Kong Litigation | | $180,000.00 |
| Special Situations Cayman Fund LP<br>527 Madison Avenue<br>26th Floor<br>New York, NY 10022 | Unpaid interest on loan to company for payment of surety for Hong Kong Litigation | | $153,000.00 |

**<u>Exhibit 4</u>**

**Summary of Assets and Liabilities**

Chinacast Education Corporation
November 9, 2016


Assets

Cash                                        $ 86,360


Litigation Proceedings
Estimated Range of Recovery

| | |
|---|---|
| US - Wu Yao | $ 0 - $  2,000,000 |
| US - Chen Zhou Guo | $ 0 - $ 20,000,000 |
| US - Justin Tang | $ 0 - $ 50,000,000 |
| HK - Jim Ma | $ 0 - $  2,000,000 |
| HK - Wu Cai Yu | $ 0 - $  4,000,000 |
| HK - Tong Chi Kar Charles | $ 0 - $  4,000,000 |
| HK - DMX Technologies | $ 0 - $  4,000,000 |


Court Judgments
Attempts to Enforce Unsuccessful

| | |
|---|---|
| US - Jiang Xiangyuan   (May 2015) | $  366,958,436 |
| HK - Jiang Xiangyuan   (February 2016) | 123,800,000 |


Liabilities

| | |
|---|---|
| 20% Notes | $   4,121,647 |
| Contingent Value Rights | 4,740,000 |
| Court Guarantee | 519,000 |
| Unpaid legal expense | 9,153,088 |
| Unpaid compensation | 3,740,000 |
| | -------------- |
| Liabililites | $ 22,273,735 |

## **Exhibit 5**

### **Litigation**

Pending:

*In re Chinacast Education Corporation Securities Litigation*, United States District Court for the Central District of California, Case No. CV 12-4621-JFW (PLAx)

*Chinacast Education Corporation v. Ron Chan Tze Ngon, Jiang Xiangyuan, Justin Tang, and Antonio Sena*, Court of Chancery of the State of Delaware, Case No. 10063-VCL

*Chinacast Education Corporation v. Guo, et al.*, United States District Court for the Central District of California, Case No. 15-CV-5475-AB-E

*Chinacast Education Corporation v. Yao, et al.*, United States District Court for the Central District of California, Case No.  16-CV-01016-RSWL-SS

*Chinacast Education Corporation v. Wu Cai Yu and Wu Ye*, High Court of The Hong Kong Special Administrative Region Court of First Instance

*Chinacast Education Corporation v. Tong Chi Kar Charles*, High Court of The Hong Kong Special Administrative Region Court of First Instance

*Chinacast Education Corporation v. DMX Technologies*, High Court of The Hong Kong Special Administrative Region Court of First Instance

*Chinacast Education Corporation v. Jim Ma*, High Court of The Hong Kong Special Administrative Region Court of First Instance